*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 57**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DR. A. LEGRAND RICHARDS,[1]
*Appellees,*

*v.*

SPENCER COX, Utah Lieutenant Governor,
*Appellant.*

No. 20180033
Filed September 11, 2019

On Direct Appeal

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 170904078

Attorneys:

David R. Irvine, Alan L. Smith, Salt Lake City, for appellees

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen.,
Stanford E. Purser, Deputy Solic. Gen., Salt Lake City, for appellant

JUSTICE HIMONAS authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, and JUDGE HAGEN joined.

ASSOCIATE CHIEF JUSTICE LEE filed a separate opinion concurring in
part and concurring in the judgment.

Having recused himself, JUSTICE PEARCE does not participate herein;
Court of Appeals JUDGE DIANA HAGEN sat.

JUSTICE HIMONAS, opinion of the Court:

---

[1] KATHLEEN MCCONKIE, RANDY MILLER, CAROL BARLOW LEAR, THE
UTAH PTA, UTAHNS FOR PUBLIC SCHOOLS, INC., and ABU EDUCATION
FUND are also parties to this appeal.

1

## INTRODUCTION

¶1 The 2016 legislature enacted Senate Bill 78 (SB 78), which imposed election laws for the office of State Board of Education member. *See* S.B. 78, 61st Leg., Gen. Sess. (Utah 2016). The question before us is not whether SB 78 is good public policy: that's a question for the citizens of Utah, speaking through their duly elected representatives. No, the question before us is whether SB 78 violates the Utah Constitution.[2] It does not.

¶2 SB 78 specifically requires "[a] person interested in becoming a candidate for the State Board of Education [to] file a declaration of candidacy" in compliance with the Utah Code sections relating to general elections,[3] and explicitly made "[t]he office of State Board of Education . . . a partisan office." UTAH CODE § 20A-14-104.1.[4] Appellees argue that article X, section 8 of the Utah Constitution, which states that "[n]o religious or partisan test or qualification shall be required as a condition of employment, admission, or attendance in the state's education systems," prohibits the legislature from establishing partisan elections as the means by which State Board of Education members (Board members) are elected. Appellant State of Utah counters that Board members are not employed in the state's education systems and are therefore not covered by article X, section 8. The State further contends that, even if Board members are employed in the state's education systems for the purposes of article X, section 8, the prohibition against "religious or partisan test[s] or

---

[2] It's neither this court's right nor its vocation to make constitutional judgments based on its view of whether the legislature has made good or bad policy judgments. As Justice Oliver Wendell Holmes once famously and wryly put it, "if my fellow citizens want to go to Hell, I will help them. It's my job." Letter from Oliver Wendell Holmes Jr. to Harold J. Laski (Mar. 4, 1920), *in* 1 HOLMES-LASKI LETTERS, 1916–1925, 249 (Mark DeWolfe Howe ed., 1953).

[3] *See* UTAH CODE §§ 20A-9-201 to -202.

[4] We note that the legislature recently enacted Senate Bill 236, which amends Utah Code section 20A-14-104.1, a portion of the Election Code that relates to how one becomes a candidate for State Board of Education, in several material ways. *See* S.B. 236, 63rd Leg., Gen. Sess. (Utah 2019). For example, it is no longer the case that "[t]he office of State Board of Education . . . [is] a partisan office." *See* UTAH CODE § 20A-14-104.1. We do not, however, look to or pass on these amendments as they would not alter the outcome under the logic of either the majority or concurring opinions.

qualifications[s]" does not apply to or establish a ban on general partisan elections for Board positions.

¶3 Because we agree with the State that Board members are not employed in the state's education systems, and are therefore not covered by article X, section 8 of the Utah Constitution, we need not reach the second question as to whether a general partisan election runs afoul of article X, section 8's ban on partisan or religious tests or qualifications.[5] Accordingly, we reverse the district court and hold SB 78 to be constitutional and commensurately allow its implementation.

## BACKGROUND

¶4 Article X, section 8 of the Utah Constitution provides that "[n]o religious or partisan test or qualification shall be required as a condition of employment, admission, or attendance in the state's education systems." In 2016, the legislature passed SB 78, which amends the Utah Election Code, makes the office of State Board of Education a partisan office, and requires Board members to be elected through the general partisan election process. *See* UTAH CODE §§ 20A-14-101.1 to -104.1. Appellees brought suit asking the district court to issue an injunction enjoining the implementation of SB 78 on the grounds that it violates article X, section 8 of the Utah Constitution.

¶5 The district court agreed with appellees, concluding that "[t]here is perhaps no more partisan a test than a contested, partisan

---

[5] The concurrence suggests that we have only resolved the "threshold question of . . . the meaning of the phrase 'employment . . . in.'" *Infra* ¶ 45. That recitation misapprehends our opinion. Unlike the concurrence, we assume that the State Board of Education is a part of the state's education systems and expressly conclude that Board members do not hold employment in those systems. The concurrence essentially does the opposite—it first concludes "that members of the Board of Education are not a part of the 'state's education systems,'" making the answer to the question of the meaning of "employment . . . in" irrelevant. *Infra* ¶ 55. We cannot get on board with the concurrence's approach, which requires us to declare that the State Board of Education—the head of much of the state's education systems—is not a part of the state's education systems. We conclude that it is unnecessary to reach the difficult question of whether the State Board of Education is part of the state's education system because, even assuming that it is, Board members are not employees in that system.

election" and that, "according to its plain meaning, Board members hold 'employment' in a legal sense in the State's education system and therefore fall within the purview of [article X, section 8]." The district court therefore issued an order declaring SB 78 unconstitutional under article X, section 8 and enjoined the implementation of SB 78. The State appealed.

¶6 We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶7 We review constitutional interpretation issues for correctness, granting no deference to the district court. *Schroeder v. Utah Att'y Gen.'s Office*, 2015 UT 77, ¶ 16, 358 P.3d 1075. "A district court's interpretation of a statute is a question of law, which we . . . review for correctness." *Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 10, 227 P.3d 256.

## ANALYSIS

¶8 Both parties agree that the legislature has the authority to prescribe election laws for the office of State Board of Education. UTAH CONST. art. X, § 3.[6] The parties disagree, however, about whether the election laws prescribed by SB 78 run afoul of article X, section 8 of the Utah Constitution.

¶9 Appellees claim that article X, section 8's language barring "religious or partisan test[s] or qualification[s]" as a "condition of employment . . . in the state's education systems" forbids partisan election of Board members. They contend that this prohibition is one of the underlying intentions of article X, section 8, as supported by the constitutional history associated with article X, section 8 and the plain language of its text.

¶10 Appellees further contend that Board members are and have been, at least since 1986, understood to be employed in the state's education systems. And as employees, they are subject to and protected by article X, section 8, which bars "religious or partisan test[s] or qualification[s]" as conditions of their employment. Appellees read "partisan test or qualification" to encompass and

---

[6] Article X, section 3 of the Utah Constitution states in relevant part: "The general control and supervision of the public education system shall be vested in a State Board of Education. The membership of the board shall be established and elected as provided by statute."

include partisan elections. The district court agreed with appellees' reading of the Utah Constitution and found SB 78 to be unconstitutional and stayed its implementation.

¶11 This appeal therefore presents us with two questions. First, we are asked to determine whether Board members enjoy "employment . . . in the state's education systems." UTAH CONST. art. X, § 8. Second, we are asked to determine whether a partisan election is a "partisan test or qualification." *Id.* Because we answer the first question in the negative, we need not reach the second question.

¶12 The district court concluded that article X, section 8 clearly applies to Board members. We disagree. To begin with, in 1986, the relevant timeframe, the citizens of Utah would not have understood the term "employment" to include elected Board members. In addition, although we have the final say as to questions of constitutional law, we "apply a presumption of validity [to a challenged statute] so long as there is a reasonable basis upon which both provisions of the statute and the mandate of the constitution may be reconciled." *Bennion v. ANR Prod. Co.*, 819 P.2d 343, 347 (Utah 1991) (citation omitted) (internal quotation marks omitted). And here, appellees have not overcome the presumption. Accordingly, we reverse the district court's decision.

## I. CONSTITUTIONAL INTERPRETATION FRAMEWORK

¶13 In interpreting the Utah Constitution, we seek to ascertain and give power to the meaning of the text as it was understood by the people who validly enacted it as constitutional law. *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 95, 416 P.3d 663 ("We agree with the dissent that originalist inquiry must focus on ascertaining the 'original public meaning' of the constitutional text."). In this regard, we "ask what principles a fluent speaker of the framers' English would have understood a particular constitutional provision to embody." *Id.* ¶ 96. This does not entail merely translating historical terms into "roughly equivalent contemporary English." *Id.* ¶ 98. It involves using all available tools—*Black's Law Dictionary*, corpus linguistics, and our examination of the "shared linguistic, political, and legal presuppositions and understandings of the ratification era." *Id.*; *see also Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 10, 140 P.3d 1235 ("[W]e recognize that constitutional language . . . is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them." (second alteration in original) (citation omitted) (internal quotation marks omitted)).

¶14 Here, we acknowledge that the text of article X, section 8 presents some surface opacity. But, as we detail below, our examination of the text and historical understanding of the terms included supports the State's interpretation. We therefore hold that the district court erred in finding that Board members held "*employment . . . in the state's education systems.*"

## II. THE MEANING OF ARTICLE X, SECTION 8

### *A. Understanding and Defining "Employment"*

¶15 The relevant language of article X, section 8 asks us to explore what it means to be in a condition of "employment . . . in the state's education systems." Because the meaning of the word "employment" seems at first to be a straightforward definitional question, we begin our inquiry there.

¶16 Both parties' briefs are replete with definitions of employment. Appellees would prefer to define employment to mean "to make use of" or "to use or engage the services of." They invite us on a tour of Shakespearian usages of the term to demonstrate the frequency of this definition's use.[7] In this sense, Board members

---

[7] Appellees' brief details the use of "employment" in various works of Shakespeare:

> Thus, Malvolio, upon discovering the letter that would gull him in his mistress's garden, exclaims, "What employment have we here?" Twelfth Night, Act 1, sc. 5, 1. 80. In his scene with the gravedigger, Hamlet says: "The hand of little employment hath the daintier sense." Hamlet, Act 5, sc. 1, ls. 65-66. Made to be a fool in the forest, Falstaff confesses: "See now how wit may be made a Jack-a-Lent when 'tis upon ill-employment." The Merry Wives of Windsor, Act 5, sc. 5, ls. 126-127. Valentine asks the Duke for pardon of his exiled men: "They are reformed, civil, full of good, and fit for great employment, worthy Lord." Two Gentlemen of Verona, Act 5, sc. 4, ls. 154-155. And Bolingbroke accuses Mobray [sic] to King Richard thus: "Look what I speak, my life shall prove it true: That Mowbray hath received eight thousand nobles in name of lendings for your highness' soldiers, the which he hath detained for lewd employments, like a false traitor and injurious villain." Richard II, Act 1, sc. 1, ls. 87-91.

(continued…)

would be employed in the state's education systems because the systems make use of and engage the services of Board members. We have no doubt that the word employment includes and encompasses this utility-based definition and can be used to connote the simple usage of a person or thing.[8] However, despite the creativity of Shakespeare—and this one, limited type of usage—the word employment lends itself to multitudinous other applications.

¶17 The State supplies us with some of these additional understandings and argues that employment means the "state of being employed," "normally on a day-to-day basis," which signifies "both the act of doing a thing and being under contract or orders to do it." This implies an understanding of the term rooted in one's experience as an employee and brings with it images of places of work, salaried compensation, jobs, and bosses.

---

*But see* WILLIAM SHAKESPEARE, CYMBELINE, KING OF BRITAIN act 3, sc. 5, ll. 2084–91 (Cloten requesting the services of Pisanio for pay and under direction: "do me true *service*, undergo those employments wherein I should have cause to use thee with a *serious industry*, that is, what . . . *I bid thee do*, to perform it directly . . . thou shouldst neither *want my means for thy relief*." (emphases added)); WILLIAM SHAKESPEARE, THE TRAGEDY OF KING LEAR act 2, sc. 2, ll. 1199–1202 (Kent imploring Cornwall not to punish a servant of the King: "I *serve* the King; on whose employment I was sent to you. You . . . show too bold malice against the grace and *person of my master* . . . ." (emphasis added)); WILLIAM SHAKESPEARE, MUCH ADO ABOUT NOTHING act 2, sc. 1, ll. 644–52 (Benedick offering his services to Don Pedro: "Will your grace *command me* any service to the world's end? I will go on the slightest errand now . . . . You have no employment for me?").

[8] Appellees also define the Board members' employment contextually by pointing out that they are "employed, as state officers, to oversee and administer the education policies for our state," and that their services are rendered "in exchange for monetary recompense." Appellees go on to contend that elected officials and bosses certainly can still be employees, and that there is nothing mutually exclusive in the roles connoted by these terms. Lastly, appellees point out that Board members are in a directed relationship—they "are accountable to their true masters, the voting public." We do not contest these points but rather take a more restrictive view of employment. *See infra* ¶¶ 18–38.

¶18 Although no one dictionary definition can be completely authoritative,[9] we are satisfied that these multiple definitions have fleshed out the bare dictionary meaning of the term. However, dictionary definitions are not sufficiently dispositive in this case. "When we speak of *ordinary* meaning, we are asking an empirical question—about the sense of a word or phrase that is most likely implicated in a given linguistic context." Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 795 (2018). We could rely on our linguistic intuition to rule one or more out. Our intuition here is that to be employed in this context entails more than just an engagement with a specific task or function. But "[o]ur human intuition of ordinary meaning . . . is fallible." *State v. Rasabout*, 2015 UT 72, ¶ 54, 356 P.3d 1258 (Lee, A.C.J., concurring). This case, furthermore, is not just about the word "employment." We must define the phrase "employment in" in the context in which it is used in article X, section 8. And dictionaries cannot provide us with this sort of contextual phrasal meaning.

¶19 We do, however, have a tool at our disposal that can help overcome these shortcomings. That tool is corpus linguistics. *See id.* ¶ 57 (Lee, A.C.J., concurring) ("Instead of just relying on the limited capacities of the dictionary or our memory, we can access large bodies of real-world language to see how particular words or phrases are actually used in written or spoken English. Linguists have a name for this kind of analysis; it is known as *corpus linguistics*."). Here, corpus linguistics can aid our inquiry into ordinary meaning beyond the assistance provided by dictionaries, and can guide us in choosing between competing and compelling definitions.

¶20 Corpus linguistics is an empirical approach to the study of language in which we search large, electronic databases of naturally occurring language. From these searches, we can draw inferences about the ordinary meaning of language based on real-world examples. *See id.* ¶¶ 57–63 (Lee, A.C.J., concurring) (providing additional background on corpus linguistics). We do not share in the opinion that corpus linguistics searches are a form of "scientific research that is not subject to scientific review." *Id.* ¶ 16; *see also In re Baby E.Z.*, 2011 UT 38, ¶ 19 n.2, 266 P.3d 702 (arguing against the

---

[9] "[T]here is no such thing as a 'main' or 'primary' dictionary definition." *State v. Rasabout*, 2015 UT 72, ¶ 50, 356 P.3d 1258 (Lee, A.C.J., concurring).

analytical or persuasive value of corpus searches).[10] Corpus linguistics is more akin to a consistent and replicable search one may conduct in a dictionary resource to ascertain the meaning of a word; corpus linguistics may be used *sua sponte* in the same way a judge may rely upon any definitional tools in ascertaining the meaning of ordinary or technical terminology. As judges we may rely upon our intuition in determining the meaning of ambiguous legal texts. However, when appropriate, we may make use of corpus linguistics to "check [our] intuition against publicly available means for assessing the ordinary meaning of a statutory phrase." *Rasabout*, 2015 UT 72, ¶ 56 (Lee, A.C.J., concurring). This case presents just such a circumstance.

¶21 We consulted two databases to conduct our corpus analysis—the Corpus of Contemporary American English (COCA) and the Corpus of Historical American English (COHA). We searched for the phrase "employment in." And we limited our searches to the years surrounding 1986—the year article X, section 8 was amended to include the language at issue.[11] When analyzing the

---

[10] This evolution and departure from our reasoning in *Rasabout* and *Baby E.Z.* is consistent with judicial trends across the nation. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206, 2238 n.4 (2018) (Thomas, J., dissenting) (utilizing corpus linguistics); *State v. Lantis*, No. 46171, 2019 WL 3979638, at *6 (Idaho Aug. 23, 2019) (using corpus linguistics as additional empirical evidence of the meaning of "disturbing the peace"); *People v. Harris*, 885 N.W.2d 832, 839 (Mich. 2016) ("The Corpus of Contemporary American English (COCA) allows users to 'analyze [] ordinary meaning through a method that is quantifiable and verifiable.'" (alteration in original) (citation omitted)). While the application of corpus linguistics to law has limitations, it can be useful in some cases in determining the common understanding of a word or phrase. It is wholly appropriate to utilize in answering some questions of statutory and constitutional interpretation. While we should still proceed somewhat cautiously, there is no reason why this court should not consider corpus linguistics and welcome parties to utilize it in briefs just as readily as they would a dictionary.

[11] Specifically, we limited our COCA search to the years 1990–1994 and our COHA search to the years 1970–1999. COCA captures contemporary usage of language and contains texts from 1990–2017. It thus cannot provide us with examples of how the phrase "employment in" was used in 1986. But we doubt that the ordinary meaning of this phrase evolved in the time period surrounding the

(continued…)

results of our searches, we focused on examples that used the phrase "employment in" in a context similar to that of article X—namely the employment of people. This is one of the advantages of corpus linguistics. It allows us to search for real-world usage of a word or phrase in the appropriate linguistic context. *See* Lee & Mouritsen, *Judging Ordinary Meaning*, *supra*, at 821–23. And here the relevant context is the "employment" of individuals, as article X is speaking of "employment" by individuals "in the state's education systems."

¶22 That kind of context cannot be derived from a dictionary. You cannot look up "employment in" an organization by an individual person in a dictionary. But you can get that kind of contextual information from a corpus. And that's what we've done here. In looking at the corpus results, we looked for examples of people having "employment in" something and determined what sense of "employment" was being used—the broader utility-based sense or the narrower job-related sense. Our searches reveal that the phrase "employment in" almost exclusively refers to some kind of legal, employment relationship.[12]

¶23 Of the 257 hits produced by the COCA search, 232 referred to a person(s) having "employment in" a job in a particular field, sector of the economy, or geographic region, or at a particular time. Only one hit referred to the broader services sense of "employment." The remainder of the hits were either inconclusive or did not refer to people having "employment in" something.

¶24 Our COHA search produced similar results. Of the 107 hits, ninety-four referred to a legal, employment relationship—to a person having a job. None of the hits referred to the broader sense—a person merely providing services for someone or something. The remaining fifteen hits were either inconclusive or did not refer to people having "employment in" something.

¶25 Our corpus analysis accordingly confirms our linguistic intuition—that "employment in" in this context refers to some sort of

---

amendments to article X. Our COHA search helps confirm this intuition.

[12] The COCA and COHA interfaces allow you to save your searches, enhancing transparency and reliability. Our searches are saved at CORPUS OF CONTEMP. AM. ENGLISH, https://www.english-corpora.org/coca/?c=coca&q=75264553 (last visited Sept. 5, 2019) (COCA) and CORPUS OF HIST. AM. ENGLISH, https://corpus.byu.edu/coha/?c=coha&q=72809944 (last visited Sept. 5, 2019) (COHA), respectively.

legal, employment relationship. And it does so "on the basis of a transparent database that is publicly available, created by linguists, and subject to replication by anyone seeking to confirm (or reject) [our] analysis." *Rasabout*, 2015 UT 72, ¶ 93 (Lee, A.C.J., concurring).

¶26 Having confirmed our initial take that employment entails more than mere utility, we make use of several legal understandings of the words employee, employer, and employment in our analysis. "The starting point for most employee status analysis cases is the 'common law right to control' test . . . ." Mitchell H. Rubinstein, *Employees, Employers, and Quasi-Employers: An Analysis of Employees and Employers Who Operate in the Borderland Between an Employer-and-Employee Relationship*, 14 U. PA. J. BUS. L. 605, 617 (2012) (citation omitted) [hereinafter Rubinstein, *Employees, Employers, and Quasi-Employers*]. This is a deceptively difficult test to apply because each application depends upon the unique circumstances of the case. *Id.* The Supreme Court has held that, in the absence of a statutorily provided definition of "employee," this common law standard should be the default. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (adopting a common law test for determining who qualifies as an "employee" under ERISA in the absence of statutory guidance). This "common law right to control" test is summarized by the following nonexhaustive factor list:

> (1) the hiring party's right to control the manner and means by which the product is accomplished; . . . (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; (13) and the tax treatment of the hired party.

Rubinstein, *Employees, Employers, and Quasi-Employers*, *supra*, at 618 (alteration in original) (citation omitted).

¶27 Using this test solely for its guidance in helping us ascertain the public meaning of employment, we see multiple factors commensurate with the State's suggested definition. Factors one, four through nine, twelve, and thirteen all pertain to vocational details and to notions of bosses, workers, employment location,

authoritative direction, and emolument relationships. This suggests that the term employee, when describing one in a condition of employment, is used in the context of workplace relations and tasks above and beyond a mere abstract use or function.

¶28 Additionally, some courts have endorsed an "economic realities test" to determine employment status. *See, e.g., Nowlin v. Resolution Tr. Corp.*, 33 F.3d 498, 505 (5th Cir. 1994) ("The economic realities test turns on whether the employee, as a matter of economic reality, is dependent upon the business to which he renders service."). This test also employs several factors in its exploration of the word employee:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. No single factor is determinative. Rather each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind.

Rubinstein, *Employees, Employers, and Quasi-Employers*, *supra*, at 626 (emphasis added) (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008)).

¶29 Many courts apply some hybridized form of both tests that centers on the notions of control and economic dependency. *Id.* ("The hybrid test combines both the common law and economic realities tests and attempts to steer a middle ground. There has been widespread adoption of this test . . . ." (citation omitted)). Here, we again see the central role that control and direction play in guiding and defining these factors. Additionally, the economic dependence elements strongly favor the State's definition and indicate that the scope of the words "employment" and "employee," in a legal sense, extends beyond mere use and into the realm of gainful employment in a vocational context.

¶30 When at least partially informed by the legal definitions available, the most relevant public understanding of employment is therefore, in our view, "[t]he relationship between master and servant . . . [w]ork for which one has been hired and is being paid by an employer." *Employment*, BLACK'S LAW DICTIONARY (11th ed. 2019). The common understanding of the word "employment" implies an additional step beyond mere idle fancy or hobbyist pursuit into

some form of employee–employer relationship. Used in this sense, we have found two definitions of "employee" particularly helpful: (1) "one employed by another [usually] for wages or salary and *in a position below the executive level*," *Employee*, WEBSTER'S NEW COLLEGIATE DICTIONARY 373 (1973) (emphasis added), and (2) "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance," *Employee*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶31 The need for such myriad definitions and artful tests to fully grasp the public meaning of the words employment and employee compels us to accede that, despite some convincing evidence to the contrary, some ambiguity as to what was understood by the term "employment in" at the time of drafting and the passage of article X remains possible. Because we are not presented with, and can locate no direct definitional guidance as to, the position of Board members within or outside of the state's education systems, we further elucidate the meaning of the relevant texts as informed by relevant constitutional and statutory provisions and their history.

*B. Utah Constitutional History*

¶32 The original text of the Utah Constitution article X, section 12—the ratification-era version of today's article X, section 8—did not include Board members. *See* UTAH CONST. art. X, § 12 (1896) (prohibiting any "religious []or partisan test or qualification . . . as a condition of admission, as *teacher or student*, into any public educational institution of the State"(emphasis added)). However, in 1986, article X was amended to forbid any "religious or partisan test or qualification . . . as a *condition of employment*, admission, or attendance in the state's education systems." UTAH CONST. art. X, § 8 (emphasis added). Appellees ask us to understand that the change from "teacher or student" to "condition of employment" was meant to broaden the provision's reach to include Board members. This we cannot do. Although not dispositive, the historical evidence provides us with no reason to believe the change in language supports this reading.

¶33 We simply cannot find any cause to believe the language regarding "condition of employment" was understood to apply to Board members. In fact, all evidence we have been presented with, if anything, cuts against this reading. Until 1986, there was no doubt that the relevant constitutional language did not apply to Board members. As the State notes, in 1982 and 1984, the Utah Constitutional Revision Commission (CRC) considered various changes to article X. The CRC proposed altering the old language,

which read "admission, as teacher or student" and "public educational institution of the State," into the modern provisions, which read "employment, admission, or attendance in the state's education systems." UTAH CONSTITUTIONAL REVISION COMM'N, REPORT OF THE CONSTITUTIONAL REVISION COMM'N SUBMITTED TO THE GOVERNOR AND THE 45TH LEGISLATURE OF THE STATE OF UTAH 57 (1984). In the CRC's own words, "[t]he only difference between the [past] language and the commission's proposal is in the use of the words 'the state's education systems' in place of 'any public educational institution of the state.' . . . It is a language change only, and not intended to have any policy effect." *Id.* We see no reason to believe the people of Utah ever understood this language differently.

¶34 Finally, the language of article X, section 8 seems to foreclose appellees' definition of employment. We read section 8 as a list of associated terms to which the religious or partisan test prohibition applies: "employment, admission, or attendance." Under the interpretive canon *noscitur a sociis*, we read associated words as bearing similar contextual meanings to each other. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012) (explaining that "words grouped in a list should be given related meanings" (citation omitted)). Applying this canon, we define employment contextually, as in some way related to the words admission and attendance. Both admission and attendance evoke a physical presence and occupation within schools and remind one of teachers and students—and perhaps janitors—but never Board members. If employment is read as similar to and associated with admission and attendance, it does not remind of or encompass Board members.

### C. Statutory and Case Law Usage of Employment

¶35 Outside of the Utah Constitution, several Utah Code provisions separate board officials from the ranks of employees, albeit in different contexts. Although not dispositive in this case, it is relevant that the concept of a board of directors harkens to corporate law and boards of corporate control. Here, there is no ambiguity: the Utah Revised Business Corporation Act explicitly omits board members from the definition of employees of a corporation while, at the same time, designating officers as employees. UTAH CODE § 16-10a-102(18) ("'Employee' includes an officer *but not a director . . . .*") (emphasis added). Indeed, the Model Business Corporation Act echoes this standard. MOD. BUS. CORP. ACT § 1.40(8) (2003) (AM. BAR ASS'N, amended 2016) ("'Employee' includes an officer but not a director."). Consistent with our examination of the everyday usage of the word and common parlance, the corporate understandings of employment also do not include board members.

¶36 Additionally, the State calls our attention to the Election Code and the Utah State Personnel Management Act, which state, respectively, that "[a] State Board of Education member may not . . . also serve as an employee of the State Board of Education," UTAH CODE § 20A-14-103(4), and that Board members are not career service employees in the classified service, UTAH CODE § 67-19-3(3), (5), (10).[13]

¶37 Several other courts have dealt with the issue of defining what is meant by "employment" and have provided helpful guidance. "The normal indicia of the employer-employee relationship . . . are contract, control, and compensation." *Am. Cas. Co. of Reading, Pa. v. Wypior*, 365 F.2d 164, 167 (7th Cir. 1966); *see also Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 952 (7th Cir. 2014) (determining that the common-law element of control is demonstrated by six nonexclusive factors, including "[w]hether the organization can hire or fire the individual or set the rules and regulations of the individual's work; [w]hether and, if so, to what extent the organization supervises the individual's work; [w]hether the individual reports to someone higher in the organization; [w]hether and, if so, to what extent the individual is able to influence the organization; [w]hether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and [w]hether the individual shares in the profits, losses, and liabilities of the organization." (citing *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449–50 (2003))); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996) (developing a five-factor test to determine whether an individual is an employee or independent contractor).

---

[13] We have found a few appellate courts that have spoken directly on this issue. *See, e.g., Mitchell v. Pruden*, 796 S.E.2d 77, 81 (N.C. Ct. App. 2017) ("A public official is one who exercises some portion of sovereign power and discretion, whereas public employees perform ministerial duties." (citation omitted) (internal quotation marks omitted)); *People v. Cleland*, 23 N.Y.S.3d 556, 559 (Cty. Ct. 2015) ("The duties of a public official involve some exercise of sovereign power—those of a public employee do not."). The concurrence mistakes our citing of this case law, which speaks on the topic of employment status, as an announcement that only lower-level, ministerial workers can be employees. *Infra* ¶ 63. We do no such thing. We are merely, as part of our cumulative analysis, suggesting that other jurisdictions have pointed in a clear direction.

¶38 This general pattern of common usage suggests that Board members are separate from employees and consistently applies the State's understanding of the term employment as involving some measure of being under direction and control. Although Board members receive compensation and benefits for their services, they have no masters within the state's education systems. To apply the Seventh Circuit's standard, they are not under contract with the state's education systems, they have no controllers within the state's education systems, and their compensation is remitted not by the state's education systems, but by Utah's Department of Administrative Services. Neither are Board members employees "in the state's education systems" in that they are accountable to their constituents. Although constituents elect Board members, they can't then hire, fire, or supervise Board members after election. In the end, Board members are representatives of, rather than employees of, their constituents.

### D. *Presumption of Legislative Validity*

¶39 If, despite the hefty weight of support for the State's position, we were to continue to acknowledge a certain level of ambiguity in the phrase "employment . . . in the state's education systems," as far as what may have been understood by the 1986 amendments, we still resolve this case in the State's favor under the presumption that legislative enactments are assumed to be constitutional.[14] "[W]hen confronted with a constitutional challenge to a statute, we presume the statute to be constitutional, resolving any reasonable doubts in favor of constitutionality." *Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 30, 144 P.3d 1109. Additionally, other courts have held that if a constitutional provision is ambiguous, the legislature, as a coequal branch of the government, is entitled to some deference in their interpretation of the constitutional text. *See Greene v. Marin Cty. Flood Control & Water Conservation Dist.*, 231 P.3d 350, 358 (Cal. 2010) ("[O]ur past cases establish that the presumption

---

[14] The concurrence seems to misunderstand this conclusion. *Infra* ¶ 52. The presumption of validity is far from the "linchpin" of our decision but is rather another factor in a long line of analysis trending towards the State's position. It is only after an exhaustive exploration of multiple tests, definitions, and standards—the great majority of which lend credence to the State's position—that we add the insight that, because no standard we have examined suggests otherwise, any remaining uncertainty should be resolved in light of the presumption of legislative validity.

of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary, a focused legislative judgment on the question enjoys significant weight and deference by the courts." (alteration in original) (citations omitted) (internal quotation marks omitted)); *see also Nelson v. Miller*, 170 F.3d 641, 652 (6th Cir. 1999) ("[T]he Michigan Supreme Court itself requires that great deference be given to the legislature's interpretation of state constitutional provisions that confer upon the legislature the affirmative duty to do something."); *Nat'l Football League v. Governor of State of Del.*, 435 F. Supp. 1372, 1384 (D. Del. 1977) ("Delaware courts subscribe to the rule of construction that when terms of the Constitution are ambiguous, the interpretation of the legislature is entitled to deference.").

¶40 Traditionally, we invoke the constitutional avoidance canon in situations in which the questioned statutory language presents two possible meanings, one of which may be unconstitutional. In such a circumstance, it "shows proper respect for the legislature" to assume it meant, and so chose, the interpretation that is in harmony with the constitution. *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. Although this case forces us to first expound upon the constitutional language of article X, section 8, we still assume that the legislature "prefers not to press the limits of the Constitution in its statutes." *Id.* (citation omitted) (internal quotation marks omitted). Of course, there is a limit: if the legislature has erred in its understanding of the constitution, it is our right and duty to intervene. We do not abrogate our duty to interpret and apply the mandates of the constitution. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). But here, the legislature passed a statute believing Board members to be exempt from article X, section 8 under their reading of the Utah Constitution. We see no real proof that this reading was incorrect and therefore defer to the legislature's interpretation of article X, section 8.[15]

---

[15] The concurrence criticizes us for not more specifically defining the standard of review when applying this presumption. *Infra* ¶ 47. But we see no reason to expand on what we have already said on this topic. *See supra* ¶ 39. In making this election, we note that the

(continued…)

**CONCLUSION**

¶41 Article X, section 8 of the Utah Constitution forbids any "partisan test or qualification" to be applied as "a condition of employment . . . in the state's education systems." Although some ambiguity may exist regarding the Board members status as employees, the Utah Constitution—both in the original 1896 enactments and the 1986 amendments pertaining to the organization and definition of the "state's education systems"—omits Board members from being in a condition of employment in the state's education systems. We reject the policy arguments against SB 78 as outside the scope of our judicial role. We reverse the district court and reinstate SB 78.

––––––––––––

presumption of legislative validity is not a factored test or a statute to be interpreted—it is a decisional framework that guides and has guided judicial review of legislative enactments. And as we clearly stated, "if the legislature has erred in its understanding of the constitution, it is our right and duty to intervene." *Supra* ¶ 40. It is our prudence that respects the legislature as a coequal branch of government and restrains our immense power to strike down legislation. This is all that is meant by our presumption.

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶42 This case presents important questions of interpretation under article X, section 8 of the Utah Constitution. That provision states that "[n]o religious or partisan test or qualification shall be required as a condition of employment, admission, or attendance in the state's education systems." UTAH CONST. art. X, § 8. The plaintiffs in this case challenge a statute, referred to herein as SB 78, under this provision. SB 78 provides for partisan election of members of the State Board of Education. The plaintiffs assert that a partisan election amounts to a "partisan test" and that members of the Board have "employment . . . in the state's education systems."

¶43 A threshold question is the meaning of the constitutional phrase, "employment . . . in the state's education systems." The plaintiffs cite dictionary definitions of "employ" that encompass the mere provision of service to something or someone. And they contend that Board members have "employment" in the "state's education systems" because they make core contributions to those systems. The lieutenant governor's view of "employment" is different. He says that this is a legal term referring to a formal relationship with an employer. And he contends that Board members are not legally employed by the "state's education systems" because they have no employment relationship with a school or other traditional component of our education system.

¶44 The majority rightly sides with the lieutenant governor on this question. And it does so, to its credit, by acknowledging some shortcomings of dictionaries in resolving the sort of question presented here, and by turning to corpus linguistic analysis to fill in the gaps. *Supra* ¶¶ 18–25. I endorse this move wholeheartedly.[1] And I concur in the court's opinion to the extent it relies on corpus linguistic analysis in support of the conclusion that a person has "employment in" an organization only if there is a formal legal relationship between a worker and an employer—the mere provision of some sort of service or contribution to an organization is insufficient. *See supra* ¶ 25.

---

[1] *State v. Rasabout*, 2015 UT 72, ¶¶ 46–50, 57–63, 356 P.3d 1258 (Lee, A.C.J, concurring in part and concurring in the judgment) (highlighting shortcomings of dictionaries in answering questions of ordinary meaning of terms and phrases and proposing the use of corpus linguistic analysis to fill in the gaps); Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788,

(continued…)

LEE, A.C.J., concurring in part and in judgment

¶45 That conclusion resolves a threshold question of ambiguity under article X, section 8 of the Utah Constitution—as to the meaning of the phrase "employment . . . in." But it does not resolve the case before us. We still have to decide whether members of the State Board of Education qualify as having "employment" in some entity, and if so whether they have "employment . . . in the state's education systems." The majority seeks to sidestep these issues. It first identifies a range of different tests that might dictate whether someone has "employment" in a given organization and then by concluding that there is a degree of ambiguity as to whether members of the Board could be deemed to be employed in "the state's education systems."[2] And it asserts that this ambiguity sustains a decision to uphold the constitutionality of SB 78 under the "presumption that legislative enactments are assumed to be constitutional." *Supra* ¶ 39.

¶46 I write separately because I have some trouble with the court's assertions of ambiguity as a basis for resolving this case. I again agree with the court's threshold interpretation of the scope of the meaning of "employment." But that determination is not sufficient to resolve the case. And the court falls short in its further attempts to identify a clear basis for its disposition.

¶47 In my view the majority opinion falls short in three respects. First, the majority never articulates a standard of deference under its stated presumption of constitutionality. It simply announces the presumption and notes that it calls for a measure of deference. In applying the presumption and citing cases in support of it, the court effectively identifies a wide range of different levels of deference. This is also problematic. Without a stated standard of deference we cannot decide whether there is an "ambiguity" sufficient to sustain a presumption of constitutionality.

---

795, 830–36 (2018) (expanding upon and explaining the role for corpus linguistics in ordinary meaning analysis); Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 PENN. L. REV. __ (forthcoming) (extending the use of corpus linguistic analysis to constitutional interpretation).

[2] Elsewhere the majority seems to suggest that members of the Board may not have "employment" with any organization at all. *See supra* ¶ 38 (suggesting that Board members "are separate from employees").

LEE, A.C.J., concurring in part and in judgment

¶48 Second, the majority never articulates a governing standard for judging whether someone would qualify as having "employment . . . in" an organization. It just cites a range of standards and says that means there is ambiguity. Without a stated standard I do not see how we can judge whether a person could be deemed to have "employment . . . in" a given organization (or even how much ambiguity there is in answering that question).[3] I concede that the question of the appropriate standard may be difficult to fully resolve on the briefing and record before us. But we need to at least define the standard we would use to determine whether Board members have an "employment" relationship with some entity before we can conclude that there is ambiguity sufficient to turn to a presumption of constitutionality.

---

[3] The majority seeks to avoid this problem by insisting that it is "expressly conclud[ing] that Board members do not hold employment in" any organization. *Supra* ¶ 3 n.5. But the court never follows through on this promised basis for its decision. It never commits itself to a test for judging whether a person has "employment in" an organization—preferring instead to identify "myriad definitions and artful tests" that *could* be controlling. *Supra* ¶ 31. And without a stated standard for judging a person's employment status, the court cannot claim to be "expressly conclud[ing] that Board members do not hold employment in" any organization. At most it is "suggest[ing] that Board members" may be "separate from employees"—under a standard that will have to be spelled out in a later case. *Supra* ¶ 38. This is not an express holding. It is the assertion of a right to decide this case without actually deciding anything.

LEE, A.C.J., concurring in part and in judgment

¶49 Third, the majority never examines the question of what qualifies as a part of "the state's education systems." This is a crucial question. Even though there may be some ambiguity about whether members of the Board of Education have "employment" in some state body, I think it's clear that they do not have "employment . . . in *the state's education systems*."[4] This becomes clear once we define what constitutes "the state's education systems"—in my view a clear reference to schools, universities, or related institutions that directly provide education to students. I would resolve the case on this ground. Because Board members have no formal legal relationship with a school or related institution, I would hold that SB 78 raises no constitutional problem and thus that there is no need to fall back on a presumption of constitutionality. I explain the basis for this conclusion below, after first outlining in more detail the concerns that I have with the majority opinion.

I

¶50 The majority hangs its hat on an ambiguity in the meaning of the notion of a person's "employment" in the "state's education systems." It cites a series of different tests for assessing a person's employment relationship, identifies a "general pattern" in these tests, and ultimately concludes that it is not clear whether "Board members" have an employment relationship "with the state's education systems" under the governing tests. *Supra* ¶¶ 26–30, 37–38. In light of these ambiguities, the court falls back on a presumption of constitutionality, holding that SB 78 withstands constitutional scrutiny because there is a degree of ambiguity in whether Board members are people who have "employment" in the "state's education systems." *Supra* ¶¶ 39–40.

---

[4] The majority is wrong to say that the meaning of "employment in" is "irrelevant" to my approach. *Supra* ¶ 3 n.5. My inquiry requires at least a threshold decision on whether "employment" is used in the broad sense of "make use of" or "use or engage the services of," as posited by the appellees in this case. Board members surely provide some service to our state's education systems, so we cannot resolve the constitutional question presented without deciding whether "employment in" is used in this broad, colloquial sense. That's why I have concurred in the majority's analysis of that question—and commended its use of corpus linguistics in the course of its assessment of that question.

LEE, A.C.J., concurring in part and in judgment

¶51 I have some trouble with this line of analysis. I find too much ambiguity in the court's assertion of ambiguity—or, in other words, insufficient transparency in the court's articulation of (a) the degree of ambiguity sufficient to trigger deference to the legislature, (b) the standard that would apply in determining whether a Board member has an "employment" relationship, and (c) what counts as part of the "state's education systems." I highlight each of these concerns below, along with some thoughts on how I would approach each issue.

A

¶52 The linchpin of the court's opinion is the presumption of constitutionality.[5] But the presumption is not articulated with any specificity. Nowhere does the court identify the degree of ambiguity that is sufficient to trigger the presumption of constitutionality, or, in other words, the level of deference we owe to the legislature.

¶53 At one point the majority says that all "reasonable doubts" should be resolved in favor of constitutionality. *Supra* ¶ 39. But the court never seeks to define what we mean by a "reasonable doubt." And it compounds the confusion by citing cases that call for deference ranging from "some deference" on one hand to "great deference" or "significant . . . deference" on the other. *Supra* ¶ 39. The court's ultimate holding seems to turn on yet another standard. In upholding SB 78 the majority says that there is "no real proof" that the lieutenant governor's view of the statute "was incorrect." *Supra* ¶ 40.

---

[5] The majority bristles at the term "linchpin." *Supra* ¶39 n.14. But its response highlights the pivotal role of the presumption in the court's analysis. I get that the court has explored a series of "tests, definitions, and standards," the "majority of which lend credence to the State's position." *Id*. And I appreciate the fact that the presumption of constitutionality is just a "factor in a long line of analysis trending towards the State's position." *Id*. But all of that just underscores my point. The majority has declined to commit itself to a definitive basis for its decision. And in the absence of such a firm basis, it is the presumption of constitutionality that is ultimately decisive. *See Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 30, 144 P.3d 1109 (explaining that we turn to the presumption only to resolve "reasonable doubts" about the constitutionality of a statute).

LEE, A.C.J., concurring in part and in judgment

¶54 I am uncomfortable with this level of imprecision. Without a clear statement of the standard of deference we owe to the legislature we open the door to the risk of arbitrary decision-making. And we deprive the parties of a clear statement of the real basis for our decision.

¶55 If this case turned on a statement of the applicable standard of deference I would press for a clarification of the governing standard. For reasons stated below, however, I do not think this case turns on a precise statement of the presumption of constitutionality. Instead I think we can resolve this case by concluding that members of the Board of Education are not part of the "state's education systems." I just flag this issue to highlight the need for us to reach it in some future case.

B

¶56 The majority also stops short of articulating a standard for assessing the existence of an "employment" relationship. It takes a step in the right direction in concluding that "employment" under Article X involves more than a vague contribution or provision of service. *See supra* ¶ 25. But the conclusion that the constitutional reference to "employment" in the state's education system requires the existence of a formal legal relationship still leaves open the question of what it takes to establish such a relationship. And the court never answers that question. It never establishes a governing test for assessing the existence of an employment relationship. Instead it cites a range of possibly applicable legal standards—"myriad definitions" of the notion of employment and a series of "artful tests" for assessing whether there is an employment relationship. *Supra* ¶¶ 26–31. The failure to pin down a legal standard, moreover, is cited as the basis for the court's determination of ambiguity—ambiguity sufficient to sustain deference to the legislature. *See supra* ¶ 31 (citing the existence of "myriad definitions and artful tests" as a basis for the conclusion that there is ambiguity as to the meaning of the constitutional language).

¶57 This too is problematic. I don't think we can say that there is "ambiguity as to what was intended by the term employment" *because* we stop short of identifying a controlling legal standard for the term "employment." The court never says it is impossible to articulate a governing standard of "employment," or that we can't decide whether Board members have an employment relationship with the "state's education systems." It just says that this area of law is a difficult one, and that the employment status of Board members is unclear. Fair enough. But the fact that employment status is often unclear doesn't mean that it is necessarily unclear here. And I don't think we can say that the question of the employment status of Board members is a matter of significant ambiguity until we do our level best to articulate a governing legal standard.

¶58 The court takes a step in that direction in citing a common law "right to control" test that incorporates multiple factors. *See supra ¶ 26* (citing Mitchell H. Rubinstein, *Employees, Employers, and Quasi-Employers: An Analysis of Employees and Employers Who Operate in the Borderland Between an Employer-and-Employee Relationship*, 14 U. PA. J. BUS. L. 605, 617 (2012)). It notes that this test has been viewed as a "default" standard that applies "in the absence of a statutorily provided definition of 'employee.'" *Supra ¶ 26* (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)). Yet the court stops short of embracing this test as the governing standard for "employment" under the Utah Constitution. Instead it states that "some courts have endorsed an 'economic realities test'" that is aimed at assessing the "economic dependence of the alleged employee" on the employer, *supra ¶ 28* (quoting Rubinstein, *supra*, at 626) (citing *Nowlin v. Resolution Tr. Corp.*, 33 F.3d 498, 505 (5th Cir. 1994)), and that others "apply some hybridized form of both tests that centers on the notions of control and economic dependency," *supra ¶ 29*.

¶59 Ultimately, the majority declines to select a test to guide the inquiry into employment status under the Utah Constitution. It just notes "the central role that control and direction play in guiding and defining" the inquiry, while also indicating that "economic dependence" is likewise a significant consideration. *Supra ¶ 29*. And it proceeds to cite provisions of the Utah Code that exclude members of a board of directors (but not officers) "from the definition of employees of a corporation." *Supra ¶ 35*. In various places the court also alludes to the idea that a person who exercises "official" discretion or "sovereign" power may not qualify as an employee, suggesting that "employment" is something done by more "ministerial" workers. *Supra ¶ 36 n.13*.

LEE, A.C.J., concurring in part and in judgment

¶60 Despite the absence of any controlling legal test the court nonetheless suggests that Board of Education members may be "separate from employees" under the "general pattern of common usage" of the legal notion of "employment." *Supra* ¶ 38. It bases that conclusion on a series of propositions: Board members "have no masters within the state's education systems," "they are not under contract with the state's education systems," "they have no controllers within the state's education systems," and "their compensation is remitted not by the state's education systems but by Utah's Department of Administrative Services." *Supra* ¶ 38. This conclusion is hedged by the ultimate assertion of "a certain level of ambiguity" on the question whether Board members qualify as having employment in the state's education systems. But the above premises seem to be the central grounds for the majority's determination of ambiguity.

¶61 I disagree with this mode of analysis. I cannot see how we can state grounds for a possible conclusion that Board members are not employees without first making an attempt at a standard for judging whether they are employees. The court effectively alludes to a possible standard in several places in the opinion. But without a statement of a governing standard—or at least the minimum criteria for employment status—I do not see how we can say whether Board members can qualify, or even whether there is ambiguity as to whether they qualify.

¶62 I would at least attempt to identify some minimal criteria for employment status. And I would then seek to apply them to the facts of the case to determine whether Board members qualify.

LEE, A.C.J., concurring in part and in judgment

¶63 The court goes astray, in my view, in suggesting one possible criterion—that only lower-level, ministerial workers can qualify as having "employment" in an organization. *See supra* ¶ 36 n.13.[6] I don't doubt that we sometimes speak of "employees" as those occupying lower-level, ministerial positions. We use the term in that sense when we are distinguishing "employees" from "management," or the like. In that sense, moreover, I don't doubt that Board members are not employees—they are not ministerial workers but the ultimate in upper-level management. Yet I'm not comfortable concluding that they therefore cannot qualify as having "employment" in any organization. Workers who fulfill upper-level management roles and thus do not report to (nor are controlled by) any other individuals seem nonetheless to qualify as having "employment" in the sense that seems relevant here—in that they are not outsiders with an independent contractor status. The majority's own analysis suggests as much. At one point, the court cites the Utah Revised Business Corporation Act, which explicitly designates corporate officers as employees. UTAH CODE § 16-10a-102(18). And yet officers who orchestrate the corporation's operations and are not subject to day-to-day control by other individuals are certainly not lower-level, ministerial workers. So I don't think this criterion is sufficient. I don't think it tells us that Board members cannot be viewed as having "employment" in any organization.

¶64 For these reasons I think we need to identify a governing standard before opining on whether Board members have "employment . . . in" some state entity. I concede that the briefing and arguments before us do not point clearly to a single standard. But I don't think the solution to this problem is to cite a point of ambiguity and turn to a presumption of legislative validity. *See supra* ¶¶ 31, 39. We can and should call for supplemental briefing if we believe we need help deciding what standard controls here.

---

[6] The majority insists that its mention of this criterion is not meant to serve as "an announcement that only lower-level, ministerial workers can be employees." *Supra* ¶ 36 n.13. But this criterion is still part of its "cumulative analysis." *Supra* ¶ 36 n.13. And for that reason I remain troubled by the majority's citation to the line of cases supporting the proposition that only public employees—not public officials—perform ministerial duties.

LEE, A.C.J., concurring in part and in judgment

¶65 I see no need to do that here, however. We can avoid this question if we can conclude that Board members have no legal relationship with an entity that is part of the "state's education systems." This highlights a final concern with the majority opinion.

C

¶66 Members of the Board of Education may well have employment somewhere within the state government. The majority never says otherwise. Instead its analysis is focused on the lack of control by or a contract or compensation from "the state's education systems." *See supra* ¶ 38.

¶67 This underscores my final concern: The court nowhere seeks to define "the state's education systems." And without a definition of that term, there is no logical way for the court to conclude that the undefined "systems" do not compensate, contract with, or control the members of the Board.

¶68 The majority seems to be suggesting that Board members may not qualify as having employment with any entity—even the state government in general. I'm skeptical of that proposition for reasons noted above. *See supra* ¶ 63. But the court should openly embrace this premise if that is the basis for its decision. Without such a premise the court's opinion seems to be missing a step. We cannot properly say that "the state's education systems" do not compensate, control, or contract with members of the Board unless we define "the state's education systems."

¶69 For the above reasons I do not think the majority has identified an adequate basis for resolution of this case. I concur in the judgment of the court, however, because I agree with the threshold premise that "employment" requires a formal legal relationship with an employer and because I conclude that members of the Board of Education have no such relationship with "the state's education systems." I reach that conclusion because I conclude that the Board of Education is not part of "the state's education systems" as that term is used in the Utah Constitution.[7]

_____

[7] The majority is skeptical of this approach and conclusion. It states that it "cannot get on board with [my] approach" because my approach "requires us to declare that the State Board of Education . . . is not a part of the state's education systems." *Supra* ¶ 3 n.5. Yet the majority offers no constitutional analysis to give credence to its concern. It makes no attempt to engage with the constitutional text and it offers no response to any of the points set forth in my opinion. Instead it just proffers a gut-level intuitive objection—a bald

(continued…)

LEE, A.C.J., concurring in part and in judgment

¶70 Article X, section 1 says that "[t]he Legislature shall provide for the establishment and maintenance of the state's education systems." And the only entities it lists as included in the "state's education systems" are a "public education system" and a "higher education system." Section 2 of article X then goes on to provide that "[t]he public education system shall include all public elementary and secondary schools and such other schools and programs as the Legislature may designate," and that the "higher education system shall include all public universities and colleges and such other institutions and programs as the Legislature may designate." So all the listed entities that are part of the "state's education systems" are schools, colleges, and universities.

---

assertion that "the head of much of the state's education systems" must be "a part of the state's education systems." *Supra* ¶ 3 n.5. But this falls short in at least two respects.

First, it is circular. The majority is in no position to claim that the State Board of Education is "the head of much of the state's education systems" without first defining what constitutes "the state's education systems." Second, the simple answer to the majority's concern is that the text of the constitution defines "the state's education systems" to the exclusion of the State Board of Education. I have laid out a basis for that conclusion above, and the majority has offered no opposition to my analysis. Perhaps my reading doesn't align with the majority's gut intuition. But that is not and cannot be the relevant constitutional inquiry. *See supra* ¶ 13 (citing *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 95, 416 P.3d 663) (stating that we interpret the constitution in accordance with its "original public meaning"); *supra* ¶ 18 (noting that our intuition about the meaning of language is "fallible") (quoting *State v. Rasabout*, 2015 UT 72, ¶ 54, 356 P.3d 1258 (Lee, A.C.J., concurring)).

LEE, A.C.J., concurring in part and in judgment

¶71 The listed entities may not constitute an exhaustive list. Article X speaks to what is "include[d]" in the "state's education systems." The argument thus could be made that the institutions defined in sections 1 and 2 are merely exemplary.[8] Even so, in context the word "include" is simply an acknowledgement of the legislature's power to establish additional schools, institutions, and programs as part of the "state's education systems." And that power would be limited—under the *ejusdem generis* canon of construction—to the kinds of institutions and programs that fulfill a similar function as those expressly listed in the constitution.[9] The listed institutions and programs are all aimed at providing instruction to students. So although the legislature can expand the "state's education systems" by establishing additional institutions and programs to educate students, its power is limited. It cannot, for example, establish a new transportation agency or economic development program and call it part of the "state's education systems." Instead the legislature has the authority to designate new entities aimed at providing education to students, and establishing such entities as part of "the state's education systems."

---

[8] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132–33 (2012) (discussing the presumption that "[t]he verb *to include* introduces examples, not an exhaustive list").

[9] *See State v. Bagnes*, 2014 UT 4, ¶ 19, 322 P.3d 719 ("Under the *ejusdem generis* canon, catchall elements of statutory lists may be 'understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent.'" (quoting *State ex rel. A.T.*, 2001 UT 82, ¶ 12, 34 P.3d 228)).

LEE, A.C.J., concurring in part and in judgment

¶72 This conclusion is also reinforced by the *noscitur a sociis* canon of construction as applied to another clause of article X, section 8—the clause referring to "employment, *admission, or attendance* in the state's education systems." The terms "admission" and "attendance" reinforce the notion that the "state's education systems" involve entities that provide education to students. Students seek "admission" and "attendance" in schools or similar entities. Those terms would not make sense as applied to an entity that merely makes policy for the operation of schools. We commonly speak of a person seeking "admission" or "attendance" in a school, university, or college. Those words, however, are not associated with a policymaking body like a Board of Education.[10] And that reinforces

---

[10] This is a conclusion that can be supported with evidence derived from a corpus linguistic search. Because the operative constitutional language was adopted in 1986, *compare* UTAH CONST. art. X, § 12 (1896), *with* UTAH CONST. art. X, 8 (1986), the question presented concerns contemporary usage of these constitutional terms, *see* Lee & Mouritsen, *supra* ¶ 44 n.1, at 824–26 (noting the importance of identifying the right timeframe for a corpus search). And the Corpus of Contemporary American English can help us understand contemporary usage. The usage question here is one of "collocation"—"the tendency of words to be biased in the way they co-occur." Susan Hunston, CORPORA IN APPLIED LINGUISTICS 68 (2002). And a collocate search in the Corpus of Contemporary American English confirms that "attendance" is strongly associated with (commonly used in conjunction with) the words "school," "college," and "university," and that "admission" is strongly associated with the words "college" and "university." *See* CORPUS OF CONTEMPORARY AMERICAN ENGLISH, https://www.english-corpora.org/coca/?c=coca&q=73806164 (last visited Mar. 15, 2019) (search results for "attendance"); CORPUS OF CONTEMPORARY AMERICAN ENGLISH, https://www.english-corpora.org/coca/?c=coca&q=73806358 (last visited Mar. 15, 2019) (search results for "admission"). Neither "attendance" nor "admission" has any apparent association with "school board," "board," or related policymaking bodies. This is another example of the sort of evidence we can get from a corpus but not from other sources (dictionaries and the like) commonly used by our courts. *See State v. Rasabout*, 2015 UT 72, ¶¶ 46–50, 57–63, 356 P.3d 125 (highlighting the deficiencies of dictionaries and other tools and explaining how corpus linguistic analysis can address these problems); Lee & Mouritsen, *supra* ¶ 44 n.1, at 807–11, 828–30 (same).

the conclusion that "the state's education systems" encompass schools, colleges, universities, and similar programs that provide education directly to students.[11]

¶73 With this in mind, I would ask whether Board members have a formal relationship with an entity that falls within the "state's education systems." And I would conclude that they do not. The Board does not directly educate students. Rather it exercises "general control and supervision of the public education system." UTAH CONST. art. X, § 3. The Board's duties are largely defined by statute. They include the responsibility to "develop policies and procedures related to federal educational programs," "make rules[] that require notice and an opportunity to be heard for an education entity affected by a state board action," control "[s]chool lunch revenues," and "establish rules and minimum standards for the public schools that are consistent with [the] public education code." *See* UTAH CODE §§ 53E-3-401, -501–17. None of these duties are within the functions filled by the institutions and programs listed in article X, section 2.

---

[11] The majority also relies on the *noscitur a sociis* canon—albeit for different reasons. It employs the canon to support its chosen definition of "employment" and to conclude that "employment" as used here "does not remind of or encompass board members." *Supra* ¶ 34. I am not opposed to reliance on this canon of construction. But I believe the majority misapplies it.

The majority argues that "[b]oth admission and attendance evoke a physical presence and occupation." *Supra* ¶ 34. That may be true. But physical presence or occupation *where*? The majority has an answer to that question—"within schools." *Supra* ¶ 34. It is this jump to "within schools," however, that I find troubling. Nothing about the words "admission" or "attendance" by themselves mandate an association with *schools*. It seems to me that the majority is drawing this association from the phrase "state's education systems"— effectively saying that the phrase "state's education systems" is defined by reference and comparison to schools. But it fails to explain why this is so.

I ultimately agree that Board members are not employed by the "state's education systems." But that's not because we aren't reminded of Board members when we read the reference to "employment" in a list that refers to "admission" and "attendance." It's because the Board is not part of the "state's education systems."

LEE, A.C.J., concurring in part and in judgment

¶74 Even if the Board of Education could be brought within the "state's education systems" as defined in article X, that article limits the "state's education systems" to those schools, institutions, and programs that the legislature designates. UTAH CONST. art. X, § 2. And the legislature has not designated the Board of Education as an institution or program that is within the "state's education systems." This is supported by the fact—which the majority notes—that Board members are compensated by the Department of Administrative Services.

¶75 There is a significant sense, of course, in which the Board of Education affects state education policy. But I do not see how that renders the Board a part of the "state's education systems." This argument proves too much, as it would sweep in not just the Board but also the legislature—which also affects education policy but cannot be thought to be subject to any constitutional bar on partisan elections.

¶76 Because I believe that the Board of Education does not fall within the "state's education systems," I would hold that Board members do not enjoy "employment . . . in the state's education systems." Thus they are not subject to article X, section 8's prohibition on partisan or religious tests as a condition of employment. I view this as a more transparent way to reach the same decision the majority reaches.