*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 7**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

JOHANNAH BRIGHT, PIA MERLO-SCHMUCKER, and LISA TAPP,
*Appellees,*

*v.*

SHERMAN SORENSEN, M.D.; SORENSEN CARDIOVASCULAR GROUP;
ST. MARK'S HOSPITAL; and IHC HEALTH SERVICES, INC.,
*Appellants.*

No. 20180528
Heard October 7, 2019
Filed February 18, 2020

On Consolidated Appeal of Interlocutory Orders

Third District, Salt Lake
The Honorable Laura S. Scott
No. 170906790
The Honorable Patrick Corum
No. 170906130
The Honorable Barry Lawrence
No. 170904956

Attorneys:

Troy L. Booher, Beth E. Kennedy, Salt Lake City;
Rhome D. Zabriskie, Provo; Rand Nolen, David Hobbs,
Houston, Texas, for appellees

Michael J. Miller, Kathleen J. Abke, Scarlet R. Smith,
Eric P. Schoonveld, Tawni J. Anderson, Nathan E. Dorsey,
Alan C. Bradshaw, Chad R. Derum, John (Jack) T. Nelson, Salt Lake
City; Andrew A. Warth, Nashville, Tennessee, for appellants

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,

in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

———————————

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Johannah Bright, Pia Merlo-Schmucker, and Lisa Tapp are former patients of Dr. Sherman Sorensen. They allege that Sorensen performed unnecessary heart surgery on them at Salt Lake City's St. Mark's Hospital and Murray's Intermountain Medical Center between 2008 and 2011. Around 2017, each of these patients saw advertising for a medical malpractice attorney who specializes in actions arising from similar surgeries. They sought review of their legal claims by the Utah Department of Occupational and Professional Licensing (DOPL) Prelitigation Review Panel, which found the claims meritorious and issued certificates of compliance. Each former patient then filed suit against Sorensen, his business entity, and either St. Mark's Hospital or IHC Health Services, Inc., which operates the Intermountain Medical Center.

¶2 These cases were considered separately—before three different district judges—in the proceedings below. In each of the three cases the defendants moved to dismiss on the ground that the plaintiffs' claims were time-barred under the Utah Health Care Malpractice Act (the Act). Citing the Act's two-year limitations period and its four-year repose period, UTAH CODE § 78B-3-404, defendants asserted that the claims were time-barred given that the latest surgery was performed in 2011 and the lawsuits weren't filed until 2017. They also contended that the time bar was not tolled by either the "foreign object" or "fraudulent concealment" exceptions set forth in the statute. *See id.* § 78B-3-404(2). Defendants opposed tolling under the latter exception on the ground that the plaintiffs had failed to allege fraudulent concealment with the "particularity" required by rule 9(c) of the Utah Rules of Civil Procedure. And one of the defendants raised a separate challenge to plaintiffs' "negligent credentialing" claim, asserting that it was barred by retroactive application of a statute enacted in 2011. *See* UTAH CODE § 78B-3-425.

¶3 The motions to dismiss were denied in large part. All three district judges held that defendants had failed to establish that plaintiffs' claims were time-barred as a matter of law. One of the three judges (in the Bright case) granted the motion to dismiss as to the negligent credentialing claim (against St. Mark's).

¶4 We granted interlocutory appeal and consolidated the three cases for review. We affirm the decisions denying the motions to

dismiss on time-bar grounds and reverse the decision dismissing the negligent credentialing claim. We hold that the fraudulent concealment and foreign object tolling exceptions in Utah Code section 78B-3-404 can extend either the limitations or repose periods. And we clarify that our pleading rules govern only claims and defenses, not responses to anticipated defenses. Because the plaintiffs raised their fraudulent concealment argument as a *response* to an anticipated affirmative defense (that the suits were time-barred), we conclude that it was subject to neither the general pleading rules under rule 8 nor the specialized pleading rules for fraud under rule 9(c). On that basis, we agree with the district courts that the plaintiffs have sufficiently alleged fraudulent concealment to avoid dismissal, and that the sufficiency of the evidence is a matter for summary judgment or trial.

¶5    We also hold that the foreign object exception applies in cases in which "foreign" material is wrongfully left in a patient, not (as here) where the material left is what was intended by a surgery. And we conclude that the Act does not retroactively bar plaintiffs' negligent credentialing claims—reversing the Bright court on this point. We remand to allow the plaintiffs to begin discovery aimed at establishing the timeliness of their complaints under the fraudulent concealment exception to Utah Code section 78B-3-404.

## I. BACKGROUND

¶6    The surgical procedure at the center of these lawsuits is aimed at closing a hole in the wall of tissue between the upper chambers of the heart. This hole, a congenital defect, is referred to as either a "patent foramen ovale" (PFO) or an "atrial septal defect" (ASD), depending on the nature of the defect. For some people with these heart defects, there is a risk that a blood clot will be forced through the hole, travel to the brain, and cause a stroke. Closing a PFO or ASD requires permanently implanting a medical device in the heart. Over time, new tissue grows over the implanted device and completely closes the hole.

¶7    Between 2002 and 2012, Sorensen, a cardiologist, held privileges at several Salt Lake City area hospitals, including St. Mark's Hospital in Salt Lake City and Intermountain Medical Center in Murray. Over that decade, Sorensen performed these PFO and ASD closures on approximately four thousand patients at St. Mark's and Intermountain Medical Center.

¶8    Bright, Merlo-Schmucker, and Tapp were among those patients who accepted Sorensen's recommendation to let him perform PFO or ASD repair. Sorensen performed Tapp's procedure

at Intermountain Medical Center on September 18, 2008, Bright's procedure at St. Mark's on December 15, 2009, and Merlo-Schmucker's procedure at St. Mark's on February 10, 2011.

¶9    According to the plaintiffs, Sorensen told them the surgeries were necessary to reduce their "extreme risk of debilitating stroke" and that the medical community recommended the procedure for persons in their condition. The plaintiffs further allege that other physicians raised concerns about Sorensen's medical practices to IHC and St. Mark's, complaining that Sorensen was regularly performing unnecessary, invasive cardiac procedures on his patients. In plaintiffs' view, about twenty-five percent of healthy adults have the relevant heart defects, but the medical consensus since 2003 has been that PFO (or ASD) closure is appropriate only rarely—when a patient has experienced recurrent, unexplained strokes. But plaintiffs allege that Sorensen performed ten to twenty times more of these heart procedures than the national average for interventional cardiologists. And none of the plaintiffs suffered from recurrent strokes or had other medical conditions that would justify a PFO or ASD closure.

¶10 In 2011 IHC conducted an internal audit of Sorensen's medical practice. The plaintiffs allege that the reviewers concluded that Sorensen had performed "multiple, medically unnecessary" PFO closures and thus "represented a threat to the health and safety of the patients treated at IHC." That June, IHC suspended Sorensen for two weeks. And in September, IHC moved again to suspend Sorensen's cardiac privileges. It also threatened to permanently suspend him and report his conduct to the National Practitioner Database. Sorensen resigned from the IHC medical staff in late 2011 before it could take either of these actions.

¶11  Around February 2014, IHC sent a letter to its patients who had undergone PFO closure with a particular device implant to warn them about a problem with the medical device. But the letter made no mention of Sorensen's suspensions, resignation, or potential abuse of the PFO procedure.

¶12 Bright and Merlo-Schmucker make related allegations concerning Sorenson's relationship with St. Mark's. They allege that St. Mark's retained Sorensen on its medical staff until his retirement in 2011, even though it was aware that IHC had suspended Sorensen for performing unnecessary heart procedures.

¶13 In 2015, some of Sorensen's former patients began to see advertising by a medical malpractice attorney who specializes in actions arising from PFO and ASD procedures. The plaintiffs in this

case allege that they only realized they might have undergone an unnecessary heart procedure once they saw this advertising.[1]

¶14 In January 2017 the plaintiffs applied for prelitigation review of their medical malpractice claims as required at that time under the Act.[2] UTAH CODE § 78B-3-412(1) (since held unconstitutional by *Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 25, 449 P.3d 31). Bright and Merlo-Schmucker filed their requests with the Utah Division of Occupational and Professional Licensing (DOPL) review panel on January 3. Tapp submitted her request on January 17.

¶15 The DOPL prelitigation panel found each patient's claims meritorious and issued certificates of compliance with the prelitigation procedures. Following the prelitigation review process, Bright, Melo-Schmucker, and Tapp filed separate suits against Sorensen and the hospitals where their procedures were performed.

¶16 The plaintiffs brought claims for negligence, negligent credentialing, and fraud. The amended complaints alleged that Sorensen, IHC, and St. Mark's took affirmative acts to fraudulently conceal the unnecessary surgeries. Specifically, the complaints alleged that Sorensen and the hospitals "created false statements and documents to conceal the fact that Sorensen was performing medically unnecessary closures," going so far as to falsify patients' medical charts.

¶17 Bright, Merlo-Schmucker, and Tapp join more than a thousand other patients with pending medical malpractice actions against Sorensen and the hospitals where he performed PFO and ASD closures. The claims are similar, and in the cases consolidated before us, substantially the same.

---

[1] Tapp alleges that she was put on notice in 2017, while Merlo-Schmucker and Bright allege in their complaints, filed on September 26, 2017, and October 23, 2017, respectively, that they were put on notice "recently."

[2] This was the relevant date for the Utah Health Care Malpractice Act's statutes of limitations and repose. UTAH CODE § 78B-3-416(3)(a) ("The filing of a request for prelitigation panel review under this section tolls the applicable statute of limitations . . . ."); *Jensen v. Intermountain Healthcare Inc.*, 2018 UT 27, ¶ 34, 424 P.3d 885 (ruling that a request for prelitigation review tolls the statute of repose).

¶18 In the Bright, Merlo-Schmucker, and Tapp cases, Sorensen and the hospitals filed motions to dismiss on the ground that the plaintiffs' claims are barred by the Utah Health Care Malpractice Act's four-year statute of repose. UTAH CODE § 78B-3-404(1). Citing this statute, the defendants asserted that the plaintiffs' claims had not been filed within four years after the date of the allegedly unnecessary surgeries and the time bar was not tolled by either the "fraudulent concealment" or "foreign object" exceptions set forth in the statute. *See id.* § 78B-3-404(2). As to "fraudulent concealment," the defendants asserted that the claims should be dismissed because the plaintiffs had failed to plead fraudulent concealment with sufficient particularity. Sorensen also argued that the negligent credentialing claims should be dismissed on the ground that negligent credentialing is no longer a cause of action under Utah Code section 78B-3-425.

¶19 All three district courts denied the defendants' motions to dismiss in large part. Each court concluded that the plaintiffs could proceed with their claims under the fraudulent concealment exception, which provides a one-year extension to the statute of repose. UTAH CODE § 78B-3-404(2)(b). On the question whether the plaintiffs had actually filed within one year of discovering the alleged fraudulent concealment, the courts concluded that this was a matter for summary judgment or trial—not for a motion to dismiss. The district court judges disagreed on one final point. The court in the Bright case granted the motion to dismiss on the negligent credentialing claim, while the courts in the Merlo-Schmucker and Tapp cases allowed the negligent credentialing claims to proceed.[3]

¶20 Before the start of discovery, Sorensen, St. Mark's, and IHC filed a request for leave to file an interlocutory appeal in each of the three cases. We granted that request and agreed to consolidation of the cases on appeal.

## II. DISCUSSION

¶21 For medical malpractice claims, Utah Code section 78B-3-404(1) establishes a two-year limitations period and a four-year repose period. Such claims must be "commenced within two years after the plaintiff or patient discovers, or through the use

---

[3] The Merlo-Schmucker and Tapp courts did not address negligent credentialing in their orders.

of reasonable diligence should have discovered the injury, whichever first occurs, but not to exceed four years after the date of the alleged act, omission, neglect, or occurrence." UTAH CODE § 78B-3-404(1).

¶22 The statute also sets forth exceptions in the form of tolling provisions. Tolling is provided for actions where there is an allegation "that a foreign object has been wrongfully left within a patient's body," and actions "where it is alleged that a patient has been prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct." *Id.* § 78B-3-404(2).

¶23 The above-quoted provisions form the backdrop of most of the arguments before us on this interlocutory appeal. One additional provision is also relevant—a 2011 amendment to the Utah Healthcare Malpractice Act, which eliminated "negligent credentialing" as a cause of action. *See* UTAH CODE § 78B-3-425.

¶24 On appeal defendants raise five sets of issues relating to the operation of these provisions: (a) whether the statute's tolling exceptions apply to the repose period (or just the limitations period); (b) whether allegations of "fraudulent concealment" are subject to a requirement of heightened pleading under civil rule 9(c); (c) whether defendants were entitled to dismissal in light of plaintiffs' allegations of fraudulent concealment; (d) whether the tolling exception for a "foreign object" wrongfully left within a patient can apply here; and (e) whether amendments to the statute retroactively bar negligent credentialing claims.

¶25 We affirm the decisions denying defendants' motions to dismiss and endorse the plaintiffs' positions for the most part. We hold that the tolling provisions apply to both the repose period and the limitations period, conclude that there is no heightened or other pleading requirement for a plaintiff in responding to an anticipated affirmative defense, uphold the determination that the question of fraudulent concealment is a matter for summary judgment or trial, determine that the foreign object exception does not apply, and hold that the 2011 amendments do not apply retroactively.

A. Tolling and the Four-Year Repose Period

¶26 A threshold question is whether the four-year repose period in subsection 404(1) is subject to the tolling provisions in subsection

404(2). Sorensen claims that the "foreign object" and "fraudulent concealment" exceptions in section 404(2) apply only to the two-year *limitations* period in section 404(1).[4] He views the four-year *repose* period as a hard-and-fast time-bar that can never be extended—even in actions involving a foreign object left in a patient or fraudulent concealment of alleged misconduct.

¶27 Sorensen thus views the four-year repose period as a categorical bar. He sees this as the whole point of a statute of repose—to set a hard cutoff for claims filed after a given event (without regard to discovery of the basis for a claim). And he views tolling as purely a matter for a statute of limitations, which is (at least often) triggered not by an event but by discovery of the basis for a claim.

¶28 Sorensen's view may reflect the ordinary operation of statutes of repose *generally*.[5] But it is incompatible with the text and structure of *this* statute of repose. And it is of course this statute of repose that we are called upon to interpret.

¶29 Subsection 404(1) presents both the two-year limitations period and the four-year repose period in a unitary time-bar provision. And subsection 404(2), in turn, modifies the time-bar provision in its entirety. The prefatory clause of 404(2) is telling. It states that the tolling provisions set forth in 404(2) apply "Notwithstanding Subsection (1)." *Id.* § 78B-3-404(2). This is a clear signal that the tolling provisions that follow (for actions involving a "foreign object" or "fraudulent concealment") are general limitations on "Subsection (1)"—not just a cherry-picked subpart of that

---

[4] The plaintiffs argue the opposite—that the exceptions modify only the repose period. But the plaintiffs' position is similarly incompatible with the terms and structure of the statute. And the cases the plaintiffs cite, such as *Day v. Meek*, 1999 UT 28, 976 P.2d 1202, interpret an earlier version of the Act, with structure quite distinct from that in place today.

[5] *See Cal. Pub. Emp's' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051 (2017) ("By establishing a fixed limit, a statute of repose implements a legislative decision that as a matter of policy there should be a specific time beyond which a defendant should no longer be subjected to protracted liability" (internal citation and quotation marks omitted)).

subsection. We see no way to read the terms of section 404 otherwise.

¶30  The exceptions in subsection 78B-3-404(2) thus apply to both the limitations period and the repose period in subsection 78B-3-404(1). As with the limitations period, the repose period is subject to extension if the statutory tolling provisions are satisfied. Thus, the discovery of a foreign object left in a patient or the fraudulent concealment of alleged misconduct may extend either the limitations period or the repose period by one year.

¶31 In so holding we reject a further argument advanced by defendants—that this construction of the statute could give a litigant *less* than two years to file suit. Defendants posit a circumstance in which fraud is discovered early on, perhaps one month after a medical procedure is performed. If the filing period is determined solely by the one-year period of limitation following discovery, defendants contend that the plaintiff would have only one year and one month to file her claim.

¶32 We disagree. Defendants' position is again rooted in a misunderstanding of the interaction between subsections 404(1) and 404(2)—and the function of the "Notwithstanding" clause in 404(2). The one-year extensions provided in subsection 404(2) are not independent, freestanding limitations periods. They are exceptions that may extend the time periods in subsection 404(1). This, again, is confirmed by the "Notwithstanding" clause—a legal construct that "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).

¶33 This confirms our interpretation and avoids the problem alluded to by defendants. The foreign object and fraudulent concealment provisions are not independent time bars; they are exceptions that may extend the otherwise "conflicting" limitations and repose periods found in Utah Code section 78B-3-404(1).

### B. Fraudulent Concealment and Heightened Pleading

¶34  Another question concerns the pleading burden of a plaintiff with regard to the exception for "fraudulent concealment." Defendants' position is straightforward: Utah Code section 78B-3-404(2) speaks of "*fraudulent* concealment," and civil rule 9(c) requires allegations of "fraud" to be made with particularity. Because the complaints in this action purportedly failed to allege fraudulent concealment with sufficient particularity, defendants assert that the complaints were subject to dismissal under rule 9(c).

¶35 Defendants' point has some facial plausibility. But it misses a threshold nuance. Our pleading rules speak only to particularity *in pleading*, and pleadings are limited to allegations of claims and defenses. *See* UTAH R. CIV. P. 7 (pleadings allowed include complaints and answers but not anticipated responses to affirmative defenses); *id.* 8 (prescribing the level of detail to be included in "claims for relief" and "affirmative defenses"); *id.* 9(c) (requiring, as an exception to rule 8, more particularity as to certain allegations).[6] Any allegations of "fraudulent concealment" in the complaints in these actions were thus not governed by our pleading rules because fraudulent concealment is not an element of a plaintiff's claim, but an anticipatory response to an expected affirmative defense.

¶36 The contents of plaintiffs' "claims for relief" are governed by rules 8 and 9(c). But plaintiffs' claims for relief are claims sounding in medical malpractice. Fraudulent concealment is raised as a response to an anticipated affirmative defense—that plaintiffs' claims are time-barred. Granted, plaintiffs included some allegations about defendants' alleged fraudulent concealment. But plaintiffs had no obligation to do so. That obligation is not found in our rules of procedure, since as noted above, those rules speak only to the requirements of a plaintiff in pleading "claims for relief" and to the requirements of a defendant in pleading "affirmative defenses."

¶37 And the obligation is likewise not found in Utah Code section 78B-3-404(2). Defendants say that the statute includes a requirement of particularized pleading. But we see nothing in the statute that speaks to this question. "[I]n an action where it is alleged that a patient has been prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct," the statute says that "the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered the fraudulent concealment, whichever first occurs." UTAH CODE § 78B-3-404(2)(b). There is a reference here to a party "alleg[ing]" fraudulent concealment. But in context, the statute is speaking only

---

[6] Rule 9 "supplements but does not supplant Rule 8['s] notice pleading" standard. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009). It thus governs the level of particularity required for allegations of fraud only if such allegations go to a claim for relief or an affirmative defense.

to *what* must be established to invoke the exception to the statute of limitations or repose. *How* the allegation must be made is not dealt with. And that is a matter governed by the Utah Rules of Civil Procedure.[7]

¶38 The legislature, in any event, lacks the power to amend our rules of procedure except by a joint resolution adopted by a supermajority vote. *See Brown v. Cox*, 2017 UT 3, ¶¶ 17–18, 387 P.3d 1040. There is no indication that those requirements were fulfilled here. And unless and until the legislature follows those requirements we are in no position to conclude that it has altered our established rules of procedure.

¶39 For these reasons we hold that a plaintiff has no obligation to plead fraudulent concealment under Utah Code section 78B-3-404(2) with particularity—or even at the level of "notice pleading" required by rule 8(a). Because fraudulent concealment under this statute is not an element of a defense, but just an anticipatory response to an expected affirmative defense, there is no pleading obligation on the plaintiff's part. The plaintiff is entitled to ignore the question of fraudulent concealment altogether—to wait to see whether the defendant will raise a time-bar defense in an answer, and to address that defense through other procedural mechanisms as they present themselves later.

¶40 Not all plaintiffs will choose that route, of course. And the plaintiffs in these cases did not choose to stay mum. They included some allegations on the question of fraudulent concealment in their complaints. And we are not suggesting that these allegations were irrelevant—or in any way insulated the plaintiffs' claims from summary dismissal.

---

[7] At oral argument in this case, counsel for the defendants raised the concern that the constraints of our heightened pleading rules are a necessary brake on the possibility that a plaintiff might make bare, unsupported allegations of fraudulent concealment in a bid to open up a "fishing expedition" in discovery. But this misses the fact that our rules contain other limitations on such practice—including the rule 11 requirement that all allegations "have evidentiary support" or at least (if "specifically so identified") be "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." UTAH R. CIV. P. 11(b)(3). And our decision today in no way eliminates any of these limits.

¶41 It has oft been observed that a plaintiff may plead her way out of court by including too much detail (or the wrong kind of detail) in a complaint.[8] That could certainly happen in a case like this one. On a motion for judgment on the pleadings, or for failure to plead a claim for which relief may be granted, the court is to accept the plaintiffs' factual allegations as true. *See Peck v. State*, 2008 UT 39, ¶ 2, 191 P.3d 4. With that in mind, a plaintiff who includes detailed allegations of relevance to an anticipated statute of limitations defense (and her anticipated response thereto) does so at her peril. Where a motion to dismiss is filed based on the anticipated defense, the district court is entitled to either rule on the pleadings or to allow the parties to convert the motion to a motion for summary judgment if further factual development is necessary.

¶42 This is the framework we endorsed in our decision in *Tucker v. State Farm Mutual Automobile Insurance Co.*, 2002 UT 54, 53 P.3d 947. There we said that a 12(b)(6) motion is an appropriate vehicle for seeking dismissal on statute of limitations grounds. *Id.* ¶¶ 8–9. But we emphasized that the basis for such a dismissal must be evident on the face of the complaint. *Id.* ¶ 8. And where the detail necessary to establish a basis for dismissal on statute of limitations grounds is not set forth on the face of the complaint, we acknowledged the discretion of the district court to either deny the motion or open the door to conversion to a motion for summary judgment. *Id.* ¶¶ 10–11.

¶43 The cases cited by the defendants are not to the contrary. These cases hold that a defendant may file a motion to dismiss a *facially untimely* complaint under rule 12(b)(6). *See, e.g., id.* ¶¶ 7–11; *Boettcher v. Conoco Phillips, Co.*, 721 F. App'x. 823, 824–25 (10th Cir. 2018).[9] When the plaintiff pleads the basis for a motion to dismiss on

---

[8] *See, e.g., Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000) (explaining that "it is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible"); *Jackson v. Marion Cty.*, 66 F.3d 151, 153 (7th Cir. 1995) (noting that "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts").

[9] *See also Lee v. Rocky Mtn. UFCW Unions & Emp'rs Tr. Pension Plan*, 13 F.3d 405 (table), 1993 WL 482951 (10th Cir. Nov. 23, 1993); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357

(continued . . .)

statute of limitations grounds and such a motion is filed, the case law says that "the plaintiff has the burden of establishing a factual basis for tolling the statute." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980). That is correct so far as it goes. When a complaint is facially untimely, a plaintiff must affirmatively advance an exception to the applicable statute of limitations to avoid dismissal. But it does not follow that a plaintiff who wishes to invoke such an exception must do so in compliance with rules 8 and 9. The exception remains a *response* to a statute of limitations defense. It is thus outside the domain of rules 8 and 9. The plaintiff's "burden" therefore, is not a pleading burden, but a burden of proof or persuasion in response to a defendant's motion to dismiss. A plaintiff could carry that burden, in other words, by advancing legal and factual support for the alleged exception to the time-bar defense—in material that may lead to the conversion of the motion to dismiss to a motion for summary judgment.

¶44 Most of the other cases cited by the defendants are in line with this view. Granted, we have said that the 9(c) particularity rule extends to a plaintiff's allegation of a claim for fraud or a defendant's assertion of an affirmative defense sounding in fraud.[10] And in a summary judgment setting, we have concededly required a party advancing an allegation of fraud (even in response to an affirmative defense) to carry the burden of proving fraud.[11] But our cases have never held that the pleading requirements of our rules extend to a mere response to an anticipated affirmative defense.

---

Motions to Dismiss—Practice under Rule 12(b)(6) ("[C]ase law makes clear[] the complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion").

[10] *See State v. Apotex Corp.*, 2012 UT 36, ¶ 2, 282 P.3d 66 (affirmative claim); *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶¶ 1, 16–18, 70 P.3d 35 (affirmative claim); *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 972 (Utah 1982) (affirmative defense).

[11] *See Norton v. Blackham*, 669 P.2d 857, 858 (Utah 1983); *Chapman By and Through Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1185–86 (Utah 1989).

¶45 The closest we have come is in dicta in *Chapman By and Through Chapman v. Primary Children's Hospital*, 784 P.2d 1181 (Utah 1989). In *Chapman*, this court held that the fraudulent concealment exception to the Utah Health Care Malpractice Act was satisfied when plaintiffs made an *independent claim* for fraudulent concealment (rather than simply alleging fraudulent concealment to invoke the statutory tolling exception). *Id.* at 1184–85. With that in mind, the *Chapman* court assumed the existence of a requirement that fraudulent concealment alleged as a response to an affirmative defense be pleaded with particularity. *Chapman* found the fraudulent concealment allegations in that case "sufficiently clear and specific" to show that "the requirement of rule 9(b)[12] ha[d] been met." *Id.* at 1186. But the question presented in today's case was never directly addressed. We never decided whether a mere response to an anticipated affirmative defense is subject to rules 8 and 9 because we were not faced with a case in which particularized pleading was lacking. *Chapman*, moreover, was decided on summary judgment.[13]

¶46 For these reasons, the *Chapman* court's assumption that particularity is required for a response to an affirmative defense is mere dicta. And dicta pertaining to our rules of procedure implicates minimal reliance interests and, accordingly, little *stare decisis* weight. *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 35–36, 345 P.3d 553 (noting that the degree of reliance on a precedent is a factor in whether to afford *stare decisis* deference); *see also Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (explaining that "[c]onsiderations in favor of *stare decisis* are at their acme in cases . . . where reliance interests are involved" and that "the opposite is true in cases such as the present one involving procedural and evidentiary rules").

¶47 *Chapman* merely assumed, without deciding, that particularity is required to allege fraudulent concealment in response to an anticipated affirmative defense (untimeliness). It left the door open for this court to reconsider the question in a case like this one

---

[12] Rule 9 has been amended and restructured in the time since *Chapman* and some of the other cases cited here. The particularity requirement that is now in 9(c) used to be in 9(b).

[13] The same goes for our decision in *Norton*, 669 P.2d at 858. That case was also decided on summary judgment. *See id.* And any references to a particularity-in-pleading requirement for a response to an anticipated defense were pure dicta.

where it is squarely presented. In doing so today, we hold that a response to an affirmative defense is not governed by the pleading requirements of rules 8 and 9 of the Utah Rules of Civil Procedure.[14] And we repudiate any dicta to the contrary in *Chapman*.

### C. Plaintiffs' Allegations of Fraudulent Concealment

¶48 The next question is whether defendants were entitled to dismissal in light of the plaintiffs' allegations of fraudulent concealment. Our rejection of the 9(c) argument goes a long way toward resolving this question. Because plaintiffs had no burden of pleading fraudulent concealment (with particularity or otherwise), the only question is whether they pleaded themselves out of court with the detail they chose to include in their complaints—by pleading detail that was not required, but that nonetheless established that their claims were time-barred as a matter of law. And we conclude that they did not.

¶49 Under section 404(2)(b) the first question is whether plaintiffs were "prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct." UTAH CODE § 78B-3-404(2)(b). If such fraudulent concealment is shown, an otherwise time-barred claim is timely if "commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered the fraudulent concealment, whichever first occurs." *Id.*

¶50 Plaintiffs in no way pleaded a basis for dismissal under these provisions. Bright, Merlo-Schmucker, and Tapp each alleged in their complaints that Sorensen and the hospitals "took affirmative steps to conceal Plaintiff[s'] cause[s] of action." They also alleged that "[b]ecause of Defendants' concealment of material facts and misleading conduct, Plaintiff[s] [were] not aware of [their] causes of action." Specifically, plaintiffs alleged that Sorensen and the hospitals "created false statements and documents to conceal the fact that Sorensen was performing medically unnecessary closures," including false medical charts.

---

[14] Our decision in *Russell Packard Development, Inc. v. Carson*, 2005 UT 14, 108 P.3d 741, is not controlling because the rule 9(c) question was not raised. But the case is in line with our decision here, in that it found a *prima facie* showing of fraudulent concealment sufficient to defeat a motion to dismiss on statute of limitations grounds.

¶51 Plaintiffs further alleged that they first realized they had potential causes of action soon before filing suit in 2017. They asserted that "a reasonable plaintiff would not have discovered the cause[s] of action earlier" and that "[p]laintiff[s] did not know, nor should have known, of the causes of action against Defendants prior to being put on notice of Defendants' potential liability" because they "neither discovered, nor reasonably should have discovered, the facts underlying [their] causes of action before any proffered statute of limitations period expired."

¶52 Plaintiffs thus made all of the allegations that the Act requires in order to toll the statute of limitations period. Again, they had no obligation to plead the terms and conditions of fraudulent concealment. Because they nonetheless chose to do so, the question is whether they provided a basis for dismissal as a matter of law on the face of their complaints. They clearly did not.

¶53 We affirm the district courts' denials of the defendants' motions to dismiss on this basis. In so doing we do not suggest that the plaintiffs' position on fraudulent concealment is meritorious. Nor do we foreclose the possibility of disposition of the fraudulent concealment question as a matter of law—on a future motion for summary judgment, for example, after any discovery or other necessary proceedings.

### D. The Foreign Object Exception

¶54 The next question concerns the applicability of the "foreign object" exception under Utah Code section 78B-3-404(2)(a). This exception provides that if an "allegation against the health care provider is that a foreign object has been wrongfully left within a patient's body, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered, the existence of the foreign object wrongly left in the patient's body, whichever first occurs." UTAH CODE § 78B-3-404(2)(a).

¶55 Plaintiffs ask us to endorse a construction of "foreign object" that encompasses the medical devices that were placed in their bodies during the surgeries in question. They cite a sense of *foreign* encompassing anything that "does not exist naturally in the body." That is one sense of *foreign*. *See Foreign*, AMERICAN HERITAGE DICTIONARY (5th ed. 2011) (defining "foreign" as "not natural; alien"). But it is not the only sense of the term. Sometimes *foreign* means "[s]ituated in an abnormal or improper place in the body and typically introduced from outside." *See id.*

¶56 The choice between these senses of *foreign* is the key to the applicability of the foreign object exception. A medical device, after all, is *foreign* in the sense of not existing naturally in the body, but *not foreign* in the sense of being "in an abnormal or improper place in the body." So we must thus choose between the *unnatural* and *improper place* senses of *foreign* to resolve this case.

¶57 We have identified various means of resolving a contest between competing senses of a statutory term. One approach is to look for the more ordinary sense of the term as used in a database of naturally occurring language—a linguistic corpus. [15] We have pursued that avenue here. We have searched for uses of the term "foreign object" in the News on the Web (NOW) Corpus in the context of medical procedures.[16] This kind of search allows us to assemble empirical data on the range of uses of "foreign object" as a

---

[15] *See Richards v. Cox*, 2019 UT 57, ¶¶ 19–20, 450 P.3d 1074 (describing the advantages of corpus linguistic analysis in identifying ordinary meaning); *State v. Rasabout*, 2015 UT 72, ¶¶ 57-63, 356 P.3d 1258 (Lee, A.C.J., concurring) (elaborating further).

[16] The NOW corpus is available at https://www.english-corpora.org/now/. It "contains 9.0 billion words of data from web-based newspapers and magazines from 2010 to the present time." *Id.* We began by searching for "foreign object" within five words of the collocates "surgery" and "procedure," but these searches yielded only six and two concordance lines of text, respectively. So instead we looked through all concordance lines of text associated with the top 100 collocates that show up most frequently within five words of the phrase "foreign object"— searching for concordance lines relating to medical procedures or surgery. Collocates with relevant concordance lines of text included "bodies", "body", "caused", "causing", "immune", "inside", "patient", "penis", "presence", "putting", "remove", "retained", "surgery", and "vagina." We also performed a similar search in the Corpus of Contemporary American English (COCA)—a corpus we have employed in prior cases. *See Richards*, 2019 UT 57, ¶ 21. But we found only three concordance lines of text that fit our search criteria—not enough data to be useful.

phrase.[17] It also allows us to look for the use of this term in the context of relevance here—medical procedures. [18] By examining "concordance lines" of text from a corpus, we can discern whether and to what extent ordinary speakers of English speak of a "foreign object" in the context of surgery in reference to all things *not existing naturally* in the body or only in reference to things *in an abnormal or improper place* in the body. We have done that here.

¶58 In this instance, however, our corpus analysis was inconclusive. [19] We found thirty-four concordance lines of text meeting our search criteria, and the above two senses of *foreign* were about evenly represented: sixteen of the concordance lines evidenced the *improper place* sense of "foreign object" (in that they involve items left unintentionally after surgery) [20] and eighteen evidenced the

---

[17] *See Richards*, 2019 UT 57, ¶¶ 18–19 (noting that "dictionaries cannot provide us with . . . contextual phrasal meaning," but corpus analysis can).

[18] This can be important, as the meaning of a term or phrase may be affected by the pragmatic or linguistic context in which it is used. *See Richards*, 2019 UT 57, ¶ 21 (noting that corpus linguistic analysis has an advantage in that "[i]t allows us to search for real-world usage of a word or phrase in the appropriate linguistic context"); Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 821–24 (2018) (explaining how semantic, syntactic, and pragmatic context can affect the meaning of words or phrases).

[19] *See* Lee & Mouritsen, *supra* note 18, at 875 (acknowledging that corpus analysis will not always yield data that is sufficiently conclusive to uncover ordinary meaning).

[20] Examples of this sense of "foreign object" in NOW include references to "surgical scissors" left inside a patient during an appendix operation, *Doctors remove 'scissors' from woman's belly*, TIMES INDIA, (May 1, 2016, 2:08 PM), https://timesofindia.indiatimes.com/city/chennai/Doctors-remove-scissors-from-womans-belly/articleshow/52068797.cms; a "30 millimetre needle" left in a child's gums after a dental procedure, *Dentist leaves 30 millimetre needle in child's gum*, DAILY NATION (May 28, 2018), https://www.nation.co.ke/news/Dentist-leaves-30-millimetre-needle-in-child-s-gum-/1056-4583032-e66ljf/; and a "surgical hook" left inside a patient's body after a hysterectomy operation, *Surgical hook left inside patient's body removed*, NEW INDIAN

(continued . . .)

*unnatural* sense of "foreign object" (in that they involve implants or medical devices left intentionally).[21]

¶59 The data, while inconclusive, are nonetheless useful. They tell us that the phrase "foreign object" is used in the context of surgery to refer commonly to both an item left in an *improper place* and an item that is *unnatural* to the body. And that requires us to look to other interpretive tools to identify the ordinary meaning of the statutory text in this linguistic setting.[22]

¶60 One important tool is an examination of the structural and linguistic context of the statute in question. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465. A statutory term may often be ambiguous when read in isolation. But we do not read statutory text "in isolation." *Id.* We read it in light of "the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." *Id.* And that context may often eliminate the apparent ambiguity. *See id.* ¶ 13 (noting that "[t]he fact that the statutory language may be susceptible of multiple meanings does not render it ambiguous; 'all but one of the meanings is ordinarily eliminated by context'" (quoting *Deal v. United States*, 508 U.S. 129, 131–32 (1993)).

---

EXPRESS (Aug. 20, 2016, 6:38 AM), https://www.newindianexpress.com/states/kerala/2016/aug/20/ Surgical-hook-left-inside-patients-body-removed-1511148.html.

[21] Examples of this sense of "foreign object" in NOW include references to organ transplants, *Gift of Life: Cartersville couple takes part in national kidney registry's paired exchange program*, DAILY TRIB. NEWS (Aug. 11, 2018), http://www.daily-tribune.com/stories/gift-of-life,19622; stents, *NTNU researches testing use of new removable stent in the lungs*, NEWS MED. (Jan. 12, 2017), https://www.news-medical.net/news/20170112/NTNU-researchers-testing-use-of-new-removable-stent-in-the-lungs.aspx; and intrauterine devices, *Women aren't being warned about the dangers of Mirena IUDs*, NEWS.COM.AU (April 25, 2018, 7:56 AM), https://www.news.com.au/lifestyle/health/health-problems/women-arent-being-warned-about-the-dangers-of-mirena-iuds/news-story/854f86588ccc2647e34266f7694eb2c8.

[22] *See* Lee & Mouritsen, *supra* note 18, at 875–76 (noting that "inconclusive data" about which of two senses is more common may tell us to look to other tools of interpretation).

¶61 Here the statutory context does eliminate the ambiguity. In the context of the language and structure of the foreign object exception to the statutory time-bars, "foreign object" cannot be viewed to encompass all objects that are merely *unnatural* to the body; it can only be viewed to extend to objects that are in an *improper place*.

¶62 The statute identifies the "discovery" of a foreign object as the moment at which this exception is triggered. UTAH CODE § 78B-3-404(2)(a). And *discovery* presupposes the placement of an object that was not the intended point of the surgery. *See Discover,* AMERICAN HERITAGE DICTIONARY (5th ed. 2011) (defining "discover" as "[t]o learn about for the first time in one's experience"). That forecloses the *unnatural* sense of "foreign object." Sorensen's patients could not be said to have later *discovered* the placement of a medical device that was the very point of their surgery. So the term *discovery* confirms that foreign objects are things left by mistake—in an *improper place*.

¶63 That conclusion is reinforced by the statute's reference to "foreign object[s] *wrongfully* left in [a] patient's body." UTAH CODE § 78B-3-404(2)(a) (emphasis added). There is nothing *wrongful* about the placement of sutures or medical devices that are the intended design of a surgery. Those things may be said to be *foreign* in the sense of being *unnatural* to the body. But the statutory reference to *wrongful* makes clear that an object is *foreign* in this statute only if it was in an *improper place*.

¶64 We reject the plaintiffs' conception of "foreign object" on this basis. In light of the language and structure of the statute, we hold that the "foreign object" exception extends only to objects wrongfully left in an improper place. The exception thus includes implements used during surgery but meant to be removed (like a sponge or clamp), or objects accidentally introduced into the body during surgery (like a Junior Mint[23]). But it does not extend to medical devices or implants that are the very point of a medical procedure.

---

[23] *See Seinfeld: The Junior Mint* (NBC television broadcast Mar. 18, 1993) (Jerry speaking to George about Kramer accidentally dropping a Junior Mint from an elevated observatory in an operating room, where it fell "into the patient," George wondering how the surgeons could "not notice it," and Jerry explaining that "it's a little mint"—"a *Junior* Mint").

¶65 Medical implants are not transformed into discoverable, wrongfully placed foreign objects when a patient later concludes that a surgery was unnecessary. We reject the plaintiffs' argument on the above grounds and hold that the foreign object exception is inapplicable in the circumstances of this case.

### E. Negligent Credentialing

¶66 The final question presented concerns the viability of plaintiffs' negligent credentialing claims. Our legislature foreclosed the viability of such claims in a statute enacted in 2011. UTAH CODE § 78B-3-425 (enacting as "the policy of this state that the question of negligent credentialing, as applied to health care providers in malpractice suits, is not recognized as a cause of action").

¶67 St. Mark's acknowledges that the surgeries in question were performed prior to the effective date of this provision. But it nonetheless asks us to apply this statute retroactively, and thus to hold that plaintiffs Bright and Merlo-Schmucker are barred from asserting claims for negligent credentialing.[24]

¶68 This position is foreclosed by our decision in *Waddoups v. Noorda*, 2013 UT 64, ¶ 13, 321 P.3d 1108. In the *Waddoups* case we expressly held that "section 78B-3-425 of the Utah Code does not apply retroactively to bar negligent credentialing claims that arose prior to its enactment." *Id.* We reinforce that decision here. And we thus reject the position advanced by St. Mark's and reverse the district court in the Bright case (the only court to have ruled on this issue), which dismissed Bright's negligent credentialing claim under Utah Code section 78B-3-425.

### III. CONCLUSION

¶69 We affirm the denial of defendants' motions to dismiss. In so doing we conclude that the statutory tolling provisions in Utah Code section 78B-3-404(2) apply to both the two-year limitations period and the four-year repose period in section 78B-3-404(1). We also hold that responses to affirmative defenses are not subject to the pleading requirements of rules 8 and 9 of the Utah Rules of Civil Procedure. And we hold that the "foreign object" exception in section 78B-3-404(2) does not apply here and that negligent credentialing claims are not foreclosed by retroactive application of

---

[24] IHC makes no such argument as to plaintiff Tapp.

section 78B-3-425. We accordingly remand for further proceedings consistent with this opinion.

¶70 In remanding we are not endorsing the timeliness of plaintiffs' claims under the "fraudulent concealment" exception. We are simply upholding the plaintiffs' opportunity to develop and present evidence in support of this exception, through discovery and subject to further motions under applicable rules of civil procedure.

———————